[No. 53061–1. En Banc. October 15, 1987.]

ALBERT LOCKWOOD, ET AL, *Respondents,* v. A C & S, INC.,
ET AL, *Defendants,* RAYMARK INDUSTRIES, INC.,
*Petitioner.*

236

*John J. Soltys, Allen R. Sakai,* and *Philip A. Talmadge* (of *Karr, Tuttle, Koch, Campbell, Mawer, Morrow & Sax, P.S.*), for petitioner.

*William S. Bailey* and *Schroeter, Goldmark & Bender,* for respondents.

DURHAM, J.—Albert and Dorothy Lockwood brought this action against a number of manufacturers of asbestos products, including petitioner Raymark Industries, seeking damages for injuries resulting from Albert Lockwood's exposure to asbestos products while he worked at various Seattle shipyards. A jury returned a verdict of $183,372 in favor of the Lockwoods. Raymark appealed and the Court of Appeals affirmed the trial court's judgment on the verdict. *Lockwood v. A C & S, Inc.,* 44 Wn. App. 330, 772 P.2d 826 (1986). In this petition for review, Raymark argues that Lockwood failed to present sufficient evidence that his injury was caused by exposure to Raymark's product in order to take the question of Raymark's liability to the jury. Raymark also contends that the trial court erred in admitting certain evidence, in deciding that Raymark had a duty to warn Lockwood of the danger of asbestos products after his exposure to asbestos had ceased, and in refusing to grant a new trial because of juror misconduct. We uphold the Court of Appeals decision affirming the trial court's judgment.

Albert Lockwood worked in shipyards in the Puget Sound region from 1942 until 1972. In the first 2 years of this period, he worked on the construction of new vessels. After that, he was employed primarily as a rigger repairing

and overhauling older vessels. This work involved moving heavy machinery aboard ships.

In his employment as a rigger, Lockwood was exposed to asbestos.[1] When moving heavy equipment, he used a chain fall, a kind of block and tackle with an endless chain. As the chain moved, it would rub against and cut into asbestos insulation which covered pipes overhead, creating asbestos dust which would fall on the riggers.

At the same time as Lockwood was working on board ship, insulation workers also were employed on the ships, putting asbestos insulation on pipes and steam turbines. Ordinarily, Lockwood did not work along with the insulation workers while they were installing asbestos. However, sometimes he worked in the same areas after the insulation workers had finished their tasks. Generally, in doing repair work, insulation workers removed old asbestos insulation as well as installing new material.

Until 1952, Lockwood worked in a number of different shipyards in the Puget Sound area. During this period, his exposure to asbestos was similar from one job to the next.

In 1952, Lockwood began working at Lake Union Drydock, where he was employed continuously for the next 20 years. Because of the time pressures involved in ship repair, he sometimes worked 24 hours a day. While at Lake Union, Lockwood was exposed to asbestos in the same way as he had been before. He was also exposed during mealtimes in that asbestos was stored in a compartment next to the area where he ate. Asbestos dust from the compartment entered the eating area and was present while he ate there. Lockwood never saw a warning on asbestos packages in the shipyards and no one ever told him to wear a mask.

In 1972, at the age of 63, Lockwood took a disability

---

[1] "'Asbestos' is the name given to a family of hydrated silicate minerals which occur naturally as masses of fibers with the unique properties of relative indestructibility and high resistance to fire." Note, *The Causation Problem in Asbestos Litigation: Is There an Alternative Theory of Liability?*, 15 Ind. L. Rev. 679 (1982).

retirement. In 1979, he was diagnosed as having asbestosis.[2]

Lockwood had smoked hand–rolled cigarettes from his teen years until 1972. In 1972, he quit regular smoking but occasionally smoked a cigarette thereafter. Lockwood also had a history of asthma and emphysema.

During the time when Lockwood was employed in the shipyards, Raymark's predecessor firm, Raybestos–Manhattan, was a manufacturer of asbestos textiles, including asbestos cloth. Raymark's asbestos cloth was used in the Puget Sound area during the period when Lockwood was employed in the shipyards.

The complaint in the present action was filed in 1982 and named 19 defendants. Lockwood's claims, as summarized later to the jury, were that: (1) the defendants were negligent in failing to test their products, remove them from the market, inform users of handling methods, and warn foreseeable users of the dangers of asbestos; and (2) the defendants were strictly liable for manufacturing or selling products that were not reasonably safe because they contained asbestos and did not contain adequate warnings of the dangers involved with asbestos use.

Pretrial proceedings were held before a special asbestos motions judge pursuant to procedures established for pending asbestos cases. Raymark brought a motion for summary judgment of dismissal on grounds of insufficient evidence of exposure to its product. The court denied Raymark's motion.

Raymark also brought pretrial motions to exclude certain documents from introduction into evidence. These documents included papers from a collection known as the

---

[2]"Asbestosis . . . is a latent disease that manifests itself 10 to 40 years after exposure to significant quantities of asbestos. Inhalation of asbestos fibers initiates a scarring process that destroys air sacs in healthy lung tissue. The result is a decrease in pulmonary function and lung volume. Symptoms associated with asbestosis include shortness of breath, coughing, chest pains, and clubbing of fingers. Although the disease is not always fatal, it is progressive and incurable." Special Project, *An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation,* 36 Vand. L. Rev. 573, 579 n.10 (1983).

"Sumner Simpson papers". This collection consists primarily of correspondence and reports from the 1930's and 1940's which were assembled by Sumner Simpson, the president of Raybestos–Manhattan from 1929 to 1948. The collection includes papers addressing research about health hazards of asbestos to workers in asbestos mines and factories. The motions judge admitted many of the challenged documents from the Sumner Simpson papers.

Raymark also sought the exclusion of documents of the Asbestos Textile Institute (ATI), a trade association of which Raymark was a member. These documents consist primarily of records and minutes of meetings of the ATI. They include discussions of health hazards of exposure to asbestos dust. The motions judge permitted the introduction of the challenged ATI documents.

Trial began in September 1983 and lasted for over 2 months. The case was tried to a jury. The evidence before the jury included expert testimony on asbestos and the disease of asbestosis, the dangerousness of asbestos to individuals in general and to shipyard workers, and the effects of combining smoking with asbestosis. Lockwood presented witnesses who testified as to which manufacturers' products were being used in the shipyards generally and in some of the shipyards and vessels where Lockwood worked.

Evidence was also presented regarding the knowledge of the asbestos industry and of certain defendants about the dangers of asbestos beginning in the 1930's. Three letters from the Sumner Simpson papers were admitted into evidence over Raymark's objection. These letters indicate that Raymark knew of possible health problems related to asbestos in the 1930's. Several of the ATI documents were introduced at trial. These documents, dating from 1954 to 1971, indicate that the asbestos industry knew of the hazards of asbestos, was reluctant to pursue studies of the effects of asbestos on health and was concerned about unfavorable publicity. In addition, several documents dating from 1974 on, which were prepared by Raymark officials and concerned asbestos health issues, were introduced into

evidence.

After the plaintiffs rested, Raymark moved for a directed verdict and dismissal based on insufficiency of the evidence. The trial court denied Raymark's motion.

Each of the trial court's instructions to the jury designated whether it applied to Lockwood's product liability claim, his negligence claim, or both.[3] The court instructed the jury that with respect to his product liability claim, Lockwood had the burden of proving that the defendant supplied a product which was not reasonably safe at the time it left defendant's control or that defendant failed to give an adequate warning necessary to make the use of the product reasonably safe; that Lockwood was injured; and that the unsafe condition of the product and defendant's failure to warn proximately caused his injury. With respect to his negligence claim, Lockwood had the burden of proving that the defendant failed to test the product, to remove the product from the market, to inform users of handling methods, or to warn foreseeable product users of the dangers of asbestos; that its conduct was negligent; that Lockwood was injured; and that the negligence was a proximate cause of his injury.

The jury began its deliberations on October 18. On the morning of October 26, the jury foreman sent the trial court a note which said:

> One of the jurors, Dale Lewis, has stated this morning that he "looked up" the defendant companies on the New York Stock Exchange early in the trial. He related this to the jury in the present stages of our deliberations.

The court responded with a note asking the foreman if Lewis had said anything to the other jurors about what he had learned. The court also told the foreman not to talk about this matter with other jurors and not to allow Lewis to discuss it further. The foreman replied to the court by note, explaining that the jury was deliberating the damages

---

[3] An appendix to this opinion contains the jury instructions pertinent to the issues presented in this case.

due the plaintiff and Lewis was discussing an amount to be awarded, when he stated that the defendants could well afford to pay, that they were all listed on the stock exchange, and that he had looked them up.

That morning, the court informed the parties of this development. Raymark brought a motion for a mistrial. The trial court denied Raymark's motion but gave the jury this supplemental instruction:

> The jury is instructed that should there be a finding of liability for the plaintiff against any defendant, the financial circumstance of the particular defendant or defendants is not to be considered by the jury in determining the amount of damages proximately resulting from a defendant's liability, if any.

The jury returned a verdict for Lockwood on both the negligence and the product liability theories. It awarded $183,372 in damages to Albert Lockwood and nothing to Dorothy Lockwood on her separate loss of consortium claim. The Lockwoods had requested $748,000. The remaining defendants moved for a judgment notwithstanding the verdict or a new trial.[4] The trial court denied Raymark's post-trial motions and entered a judgment on the verdict. The Court of Appeals affirmed the trial court's judgment. This court granted Raymark's petition for review of the Court of Appeals decision.[5]

### SUFFICIENCY OF THE EVIDENCE TO WITHSTAND RAYMARK'S MOTIONS TO DISMISS

The first issue we must address is if Lockwood presented sufficient evidence of causation so as to survive Raymark's motions for a directed verdict, judgment notwithstanding the verdict, or a new trial. Raymark argues that the evidence was too tenuous to establish that exposure to its product proximately caused Lockwood's injury and, there-

---

[4]By this time, a number of the original defendants had been dismissed or had settled with Lockwood.

[5]Lockwood died of asbestosis in 1987, about 3 weeks before this court heard oral argument in the present case.

fore, that the trial court erred in denying its motions. Essentially, the trial court determined that Lockwood had established a prima facie case against Raymark by presenting evidence that exposure to asbestos causes asbestosis; that once asbestos dust is released, it can remain in the air and drift with air currents for a long period of time; and that Raymark's product was located at shipyards where Lockwood was employed during the period when he worked there.

In ruling on a motion for a directed verdict or judgment notwithstanding the verdict, the court must accept the truth of the nonmoving party's evidence and draw all favorable inferences that may reasonably be evinced. *Levy v. North Am. Co. for Life & Health Ins.*, 90 Wn.2d 846, 851, 586 P.2d 845 (1978). The evidence must be viewed in the light most favorable to the nonmoving party. *Davis v. Globe Mach. Mfg. Co.*, 102 Wn.2d 68, 73, 684 P.2d 692 (1984). The court may grant the motion only where there is no competent evidence or reasonable inference which would sustain a verdict in favor of the nonmoving party. "If there is any justifiable evidence upon which reasonable minds might reach conclusions that sustain the verdict, the question is for the jury." *Levy*, at 851. With this standard in mind, we must review the record to determine if Lockwood presented sufficient evidence against Raymark so that the jury should decide the question of Raymark's liability.

Lockwood presented experts who testified about how shipyard workers were exposed to asbestos. Dr. Steven Levin, a physician in occupational environmental medicine, testified that individuals who did not work directly with asbestos but worked in areas where asbestos work was performed could be exposed to asbestos as bystanders. He stated that asbestos dust released into the air by asbestos workers would hang in the air and become diffused, so that persons working in the area where asbestos was being used could inhale asbestos fibers. Dr. Levin further testified that released asbestos fibers drifted with air currents, thus spreading over time throughout a working area. He also

stated that riggers in shipyards were exposed to asbestos as bystanders in areas where asbestos insulation was being applied or torn off. Other experts also testified that asbestos dust could remain floating in the air once it was released; that bystanders not directly working with asbestos were at risk of becoming diseased; and that exposure to asbestos has a cumulative effect in contributing to disease. In addition, a shipyard worker testified that when asbestos insulation is removed or installed, asbestos dust is created.

Lockwood also presented witnesses who identified certain manufacturers' asbestos products as having been present in shipyards in the Puget Sound area. George Norgaard, who worked for an insulation subcontractor and supervised workers applying insulation products on ships from 1957 to 1960 in the area, testified that Raymark, among other manufacturers, supplied his employer with asbestos cloth.

Benjamin Bradley, who worked as an insulator from 1935 to 1957 in Seattle area shipyards, testified that he saw Raymark asbestos cloth in the warehouse at Todd Shipyards during the period from 1940 to 1943, and that Raymark cloth was used on the job there. He further testified that during that time period, he saw the same materials at the warehouse at the Seattle–Tacoma yard. Bradley also specifically identified Raymark's product as present at the warehouse in the Seattle–Tacoma yard in 1946. In addition, Bradley testified that while working on the conversion of a large liner called the *George Washington* at Puget Sound Bridge and Dredge in 1947 and 1948, insulators used the same asbestos materials as those used at Todd in 1946. Bradley also specifically testified that Raymark asbestos products were used on a large liner conversion at Puget Sound Bridge and Dredge in 1947 and 1948.

Albert Lockwood himself identified the names of manufacturers of some of the asbestos products that were in the shipyards when he was there. Raymark was not one of the manufacturers he identified, although he testified that there were others besides those he could recall. Lockwood also testified that he had worked on the overhaul of the

*George Washington* and that there was asbestos on that kind of job.

Raymark argues that the evidence presented by Lockwood was insufficient to establish that exposure to its product proximately caused his injury and, therefore, the question of Raymark's liability should not have been presented to the jury. Raymark emphasizes that Lockwood did not personally handle asbestos products in his work, and that his primary exposure to asbestos occurred when asbestos was torn from vessels during rigging. It observes that there was no specific, direct evidence that asbestos torn by riggers was asbestos cloth, let alone cloth made by Raymark. Raymark also points out that the identification of its cloth at trial related to the application of asbestos rather than the tearing out of old asbestos. In addition, other asbestos cloth manufacturers served shipyards where Lockwood worked. Raymark also relies on testimony by one of its officials that asbestos cloth is cleaner than other types of asbestos products such as cement and block products. Raymark further emphasizes that Lockwood himself never personally identified its product as present during ship repair. In addition, there is no direct evidence that Lockwood worked with or near Raymark cloth on the *George Washington* or that Raymark cloth was torn from that vessel.

Generally, under traditional product liability theory, the plaintiff must establish a reasonable connection between the injury, the product causing the injury, and the manufacturer of that product. In order to have a cause of action, the plaintiff must identify the particular manufacturer of the product that caused the injury. *Martin v. Abbott Labs.*, 102 Wn.2d 581, 590, 689 P.2d 368 (1984).[6]

---

[6]This court has eased the strict requirements of the traditional approach where there are unusual problems involved in product identification. In *Martin v. Abbott Labs.*, 102 Wn.2d 581, 689 P.2d 368 (1984), we adopted the theory of market–share alternate liability in a product liability action against DES manufacturers.

During oral argument before this court, Raymark urged that we apply the market–share alternate liability theory to the present case. However, Lockwood's

■ This does not mean, however, that a plaintiff in Lockwood's position must personally identify the manufacturers of asbestos products to which he was exposed in order to recover from those manufacturers. Because of the long latency period of asbestosis, the plaintiff's ability to recall specific brands by the time he brings an action will be seriously impaired. A plaintiff who did not work directly with the asbestos products would have further difficulties in personally identifying the manufacturers of such products. The problems of identification are even greater when the plaintiff has been exposed at more than one jobsite and to more than one manufacturer's product. *See* Special Project, *An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation,* 36 Vand. L. Rev. 573, 609–10 (1983); Note, *The Causation Problem in Asbestos Litigation: Is There an Alternative Theory of Liability?,* 15 Ind. L. Rev. 679, 681 (1982). Hence, instead of personally

---

case was not tried under this theory. With respect to both Lockwood's negligence claim and his product liability claim, the trial court instructed the jury as follows regarding causation.

> If you find two or more causes combine to produce a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about harm, each is charged with responsibility for the harm.

Instruction 5.

> . . . When the concurring negligence and/or product liability of two or more defendants are each proximate cause of an injury, each is liable regardless of the relative degree in which each contributes to the injury . . .

Instruction 6.

The applicability of market–share alternate liability theory to asbestosis cases is a substantial and complex issue. We decline to address it in detail here. Not only was this theory not used at trial, but Raymark did not urge adoption of the theory in its appellate briefs or in its petition for review. Furthermore, unlike in *Martin,* where it was impossible to identify the manufacturer of the product allegedly causing the injury, plaintiff in the present case presented evidence as to the identity of manufacturers of the products at his workplace, which, in combination with other evidence, satisfies the requirements of traditional proximate causation. Hence, there is no need to consider the applicability of alternative theories of liability in this case. We note, however, that the use of market–share alternate liability theory in the asbestos products context is not without difficulties. *See* Note, *The Causation Problem in Asbestos Litigation: Is There an Alternative Theory of Liability?,* 15 Ind. L. Rev. 679, 691–711 (1982); *see also Celotex Corp. v. Copeland,* 471 So. 2d 533, 536–39 (Fla. 1985).

identifying the manufacturers of asbestos products to which he was exposed, a plaintiff may rely on the testimony of witnesses who identify manufacturers of asbestos products which were then present at his workplace.

Viewing the evidence presented in this case in the light most favorable to Lockwood, we believe that it would be reasonable for a factfinder to infer that he was exposed to Raymark's product. Several portions of the record, in combination, create such an inference. First, Benjamin Bradley's testimony that Raymark's product was used on a large liner conversion at Puget Sound Bridge and Dredge in 1947 and 1948, and Lockwood's testimony that he had worked on the overhaul of the *George Washington* and that there was asbestos on that type of job, indicate that Raymark's product was used on a ship where Lockwood worked. The second significant portion of the record is the expert testimony that after asbestos dust was released, it drifted in the air and could be inhaled by bystanders who did not work directly with asbestos. Thus, even if Lockwood did not work directly with Raymark's product on the *George Washington,* it is reasonable to infer that since that product was used on that ship when Lockwood worked there, Lockwood was exposed to it. In addition, it does not matter if the identification of Raymark's cloth on the *George Washington* related to newly applied cloth rather than old asbestos products, because evidence was presented that the application of new asbestos as well as ripping out of old asbestos creates asbestos dust. Finally, although a Raymark official testified that Raymark cloth was clean compared to other types of asbestos products, Raymark has not pointed to any evidence in the record that the handling of Raymark cloth creates no asbestos dust.

In sum, the evidence Lockwood presented creates a reasonable inference that he was exposed to Raymark's product. When this is combined with the expert testimony that all exposure to asbestos has a cumulative effect in contributing to the contraction of asbestosis, it would be reasonable for a jury to conclude that Lockwood's exposure

to Raymark's product was a proximate cause of his injury. Therefore, the trial court properly determined that Lockwood presented sufficient evidence to establish a prima facie case against Raymark, so that the question of Raymark's liability should be taken to the jury. We affirm the trial court's denial of Raymark's motions for a directed verdict, judgment notwithstanding the verdict, or a new trial on these grounds.

■ While we agree with the trial court's ultimate conclusion as to Lockwood's establishment of a prima facie case against Raymark, we recognize that, because of the peculiar nature of asbestos products and the development of disease due to exposure to such products, it is extremely difficult to determine if exposure to a particular defendant's asbestos product actually caused the plaintiff's injury. Trial courts should consider a number of factors when determining if there is sufficient evidence for a jury to find that causation has been established. They should consider the evidence of plaintiff's proximity to the asbestos product when the exposure occurred and the expanse of the work site where asbestos fibers were released. They should also take into account the extent of time that the plaintiff was exposed to the product. As the time of exposure to asbestos dust increases, so does the severity of diseases associated with such exposure. *See* 15 Ind. L. Rev. at 693.

Courts should also consider the types of asbestos products to which the plaintiff was exposed and the ways in which such products were handled and used. Asbestos products exist in a wide variety of forms, which differ in the amounts and percentages of asbestos they contain. In addition, the tendency of such products to release asbestos fibers into the air depends on their form and on the methods in which they are handled. *See* 15 Ind. L. Rev. at 691–92.

In addition, trial courts must consider the evidence presented as to medical causation of the plaintiff's particular disease. Such evidence would include expert testimony on the effects of inhalation of asbestos on human health in

general and on the plaintiff in particular. It would also include evidence of any other substances that could have contributed to the plaintiff's disease, and expert testimony as to the combined effects of exposure to all possible sources of the disease. The consideration of other potential sources of the plaintiff's injury is necessary because exposure to materials other than asbestos may also cause a number of the diseases associated with inhalation of asbestos fibers, and the risk of contracting disease may be increased by the combined effects of exposure to more than one substance, such as asbestos and cigarette smoke. *See* 15 Ind. L. Rev. at 694–95.

Ultimately, the sufficiency of the evidence of causation will depend on the unique circumstances of each case. Nevertheless, the factors listed above are matters which trial courts should consider when deciding if the evidence is sufficient to take such cases to the jury.

## ADMISSIBILITY OF EVIDENCE

Raymark also challenges the trial court's admission of certain evidence showing its knowledge of the dangers of asbestos products. While some of Raymark's legal arguments relate to more than one category of the challenged evidence, we will consider each category separately.

### Sumner Simpson Papers

Raymark argues that the trial court erred in admitting documents from the Sumner Simpson papers because they were not properly authenticated, were not relevant, and were unduly prejudicial. The Sumner Simpson papers consist of almost 6,000 documents in all. Most of them were found in a box in a storage area at Raybestos–Manhattan in the early 1970's, and some additional papers were found in an old safe at a Raybestos–Manhattan plant in 1979. *See Lohrmann v. Pittsburgh Corning Corp.,* 782 F.2d 1156, 1159 (4th Cir. 1986). The three documents from the Sumner Simpson papers that were introduced at trial are letters.

The first letter, dated September 25, 1935, was written

by A. F. Rossiter, the editor of Asbestos Magazine, to Sumner Simpson. The letter includes the following statement to Simpson:

You may recall that we have written you on several occasions concerning the publishing of information, or discussion of, asbestosis and the work which has been, and is being done, to eliminate or at least reduce it.

Always you have requested that for certain obvious reasons we publish nothing, and, naturally your wishes have been respected.

Possibly by this time, however, the reasons for your objection to publicity on this subject have been eliminated, and if so, we would like very much to review the whole matter in "Asbestos".

The next letter, dated October 1, 1935, is from Simpson to Vandiver Brown, an attorney at Johns–Manville Corp. Simpson enclosed a copy of Rossiter's letter and stated, "I think the less said about asbestos, the better off we are . . ." Simpson also observed that there had been a number of articles on asbestos dust control and asbestosis in British trade magazines and that Asbestos Magazine had been "very decent about not re–printing the English articles." Simpson asked for Brown's opinion on the matter.

The third letter, dated October 3, 1935, is a reply from Brown to Simpson. Brown stated, "I quite agree with you that our interests are best served by having asbestosis receive the minimum of publicity." Brown further stated that even if they eventually decided not to object to the publication of an article on asbestosis in the magazine, they should warn editors to use American data because the clinical picture in North American localities where there was an asbestos dust hazard was considerably milder than that reported in England and South Africa.

Raymark argues that the papers were not properly authenticated, contending that there are serious doubts about how they were assembled, their custodial history, and their genuineness. ER 901(a) provides that the requirement of authentication "is satisfied by evidences sufficient to support a finding that the matter in question is what its

proponent claims." A document conforms with this requirement if it meets the following criteria for ancient documents in ER 901(b)(8):

> Evidence that a document or data compilation, in any form, (i) is in such condition as to create no suspicion concerning its authenticity, (ii) was in a place where it, if authentic, would likely be, and (iii) has been in existence 20 years or more at the time it is offered.

In this case, the motions court specifically found that the Sumner Simpson papers met each of these criteria. In making these findings, the court relied on the information on the face of the documents and in a deposition of William Simpson, an officer of Raymark and the son of the deceased Sumner Simpson. We conclude that William Simpson's deposition provides sufficient evidence to support the motions court's finding that the papers are authentic under ER 901(b)(8). *See also Cathey v. Johns–Manville Sales Corp.,* 776 F.2d 1565, 1573 (6th Cir. 1985), *cert. denied,* 106 S. Ct. 3335 (1986) (trial court did not abuse its discretion in deciding there was sufficient evidence that Sumner Simpson papers were authentic).

Raymark further contends that the Sumner Simpson papers were not relevant to Lockwood's claims of negligence and product liability. The motions court denied Raymark's motion to exclude the documents on these grounds, finding that "the objection as to relevance goes to the weight of the evidence to be accorded to the documents rather than to their admissibility".

■ The essence of Lockwood's negligence claim was that Raymark was negligent in failing to warn foreseeable product users of the dangers of asbestos. The focus of the inquiry into alleged negligence is on the reasonableness of the manufacturer's conduct. *Davis v. Globe Mach. Mfg. Co.,* 102 Wn.2d 68, 72, 684 P.2d 692 (1984). A manufacturer can be found negligent for failing to give an adequate warning of the hazards involved in using its product which are known, or in the exercise of reasonable care should have been known, to the manufacturer. *Callahan v. Keystone*

*Fireworks Mfg. Co.,* 72 Wn.2d 823, 827, 435 P.2d 626 (1967); *Novak v. Piggly Wiggly Puget Sound Co.,* 22 Wn. App. 407, 412, 591 P.2d 791 (1979). Hence, the manufacturer's knowledge of the product, its dangerousness, and the hazards involved in reasonably foreseeable uses of the product, is pertinent in determining the reasonableness of the manufacturer's conduct in failing to warn users.

Evidence is relevant if it tends to make the existence of any fact that is material to the determination of an action more or less probable than it would be without the evidence. ER 401. Lockwood introduced the Sumner Simpson papers to show that Raymark knew or should have known of the hazards posed by asbestos products to shipyard workers. The letters at issue indicate that in the 1930's, Raymark knew that health hazards were associated with asbestos. Raymark contends, however, that the papers are too remote in subject matter and time to be relevant to the foreseeability of the harm of asbestos to shipyard workers.

Regarding the subject matter of the documents, Raymark emphasizes that the Sumner Simpson papers focus on asbestos factory workers and the hazards associated with exposure in asbestos factories, and do not mention shipyard workers. Raymark argues that exposure in factories differed significantly from exposure in shipyards, noting that factory workers handled raw forms of asbestos, while workers in shipyards were exposed to asbestos end products. Raymark contends that because of this difference, evidence of knowledge of hazards to workers in asbestos factories is not relevant in cases involving shipyard workers.

Other courts have held, however, that the evidence in these papers is relevant in a negligence claim by shipyard workers where the manufacturer's actual or constructive knowledge of the dangers of its product is an element of proof. In *Jackson v. Johns–Manville Sales Corp.,* 750 F.2d 1314, 1318 (5th Cir. 1985), *cert. denied,* 106 S. Ct. 3339 (1986), the court held that the three letters at issue here were relevant to the foreseeability of harm to shipyard workers. It noted that the letters appeared to pertain to the

problems of asbestos dust control in general. Furthermore, the court observed that even if the letters implicitly referred only to factory workers, any distinction between exposure to different types of workers went more to the weight than the admissibility of the evidence. It reasoned that a study indicating that exposure to asbestos is likely to harm one group of workers "is at least suggestive of the fact that other groups of workers who are also exposed to asbestos fibers face similar dangers." *Jackson,* at 1318. *See also Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492, 1500 (11th Cir. 1985) (the three letters strengthen the inference that defendants knew or should have known that users of their asbestos insulation ran a risk of contracting asbestosis).

We agree with these courts that the subject matter of the letters is not so remote as to render them irrelevant to a negligence claim by a shipyard worker. Furthermore, we concur with the motions court in this case that Raymark's argument relates more to the weight to be accorded to the evidence in these documents than to their admissibility. Raymark had ample opportunity to inform the jury of the documents' significance.

Regarding the date of the documents, the court in *Jackson* concluded that they were not too remote in time to be relevant where the plaintiff's claims concerned alleged exposure to asbestos products during a period beginning some 20 years after the letters were written. It reasoned that evidence that there was knowledge of the hazards of asbestos products in 1935 made the plaintiff's allegation that such hazards were foreseeable in 1953 more likely than it would have been without such evidence. *Jackson,* at 1318–19. Likewise, we believe that the evidence that Raymark knew of the dangers of asbestos in the 1930's is relevant to the foreseeability of such dangers during the period when Lockwood alleged he was exposed to Raymark's product.

In short, the evidence in the letters tends to make Lockwood's allegation that Raymark knew or should have

known of the dangers of asbestos to shipyard workers when he was exposed to asbestos products more probable than it would be without such evidence. Therefore, the letters were relevant to Lockwood's negligence claim.

Raymark also argues that the evidence in the letters of Raymark's knowledge of the dangers of asbestos was not relevant to Lockwood's product liability claim. The negligence theory of recovery focuses on the reasonableness of the manufacturer's conduct, but a strict product liability claim centers on the product itself and the consumer's expectations. *Davis*, at 72. Thus, in *Lenhardt v. Ford Motor Co.*, 102 Wn.2d 208, 212–13, 683 P.2d 1097, 47 A.L.R.4th 609 (1984), we held that, because the reasonableness of the defendant's conduct was irrelevant in a strict liability case, the defendant could not introduce evidence of its compliance with industry customs and standards, unless the issue was first raised by the plaintiff. The introduction of such evidence wrongly incorporated negligence concepts into the strict liability context, by shifting the jury's attention from whether the product was dangerous beyond the reasonable expectations of the ordinary consumer to the reasonableness of the defendant's conduct.[7]

In *Kisor v. Johns–Manville Corp.*, 783 F.2d 1337 (9th Cir. 1986), the plaintiff brought a tort action against asbestos manufacturers, relying solely on a strict liability theory. Drawing upon our decision in *Lenhardt,* the federal court held that evidence of industry knowledge of the danger of asbestos exposure was inadmissible because it put negligence concepts before the jury, which are irrelevant in a strict product liability action under Washington law. *Kisor,* at 1341. The court also held that, because evidence of the manufacturer's lack of knowledge had been admitted and only a strict liability theory was presented to the jury, the

---

[7]Because *Davis v. Globe Mach. Mfg. Co.*, 102 Wn.2d 68, 684 P.2d 692 (1984) and *Lenhardt v. Ford Motor Co.*, 102 Wn.2d 208, 683 P.2d 1097, 47 A.L.R.4th 609 (1984) concerned causes of action that arose before the effective date of the Washington tort reform act of 1981, RCW 7.72.010 *et seq.*, that act did not apply to those cases. The same is true of Lockwood's claims.

trial court should have instructed the jury that a manufacturer's lack of knowledge of the danger of its products was not a defense to a strict liability claim. *Kisor*, at 1342.

The court in *Kisor* contrasted that case with *Gammon v. Clark Equip. Co.*, 104 Wn.2d 613, 707 P.2d 685 (1985), a case tried on theories of both negligence and strict liability. In *Gammon*, the trial court had refused to instruct the jury that a seller or supplier of a product that is not reasonably safe is liable for resulting harm even though it used reasonable care. Plaintiffs argued that the instruction was necessary to clarify the distinction between negligence and strict liability. We held that, read as a whole, the instructions given did not interject negligence principles into the strict liability cause of action and adequately differentiated between the two theories of liability. Therefore, it was not necessary to instruct the jury further. *Gammon*, at 617–18.

In the present case, the motions court ruled that the Sumner Simpson papers could be used with respect to Lockwood's strict liability claim "at the discretion of the trial court . . . in the event Raymark denies dangerousness or feasibility." The record does not indicate if the trial court ever ruled on this matter. During trial, Raymark denied that its products were dangerous. However, it never requested an instruction from the trial court limiting use of the letters to Lockwood's negligence claim as opposed to his strict liability claim. Absent a request for a limiting instruction, evidence which is admitted as relevant for one purpose is deemed relevant for others. Any error for failure to instruct is waived by the party against whom the evidence is admitted. ER 105. *See also* 5 K. Tegland, Wash. Prac., *Evidence* § 24, at 65 (2d ed. 1982). Hence, Raymark failed to preserve for appeal any error in admitting the Sumner Simpson papers for purposes of proving Lockwood's product liability claim.

Raymark also did not request an instruction indicating that the manufacturer's knowledge of the danger of its product is not relevant to a strict liability claim, nor did it assign error to the trial court's instructions on appeal. It is

noteworthy, however, that the trial court thoroughly and accurately instructed the jury on the negligence and strict liability theories and clearly distinguished between them. Taken together, these instructions allowed counsel to argue their theories of the case, properly informed the jury of the applicable law, and were not misleading. Therefore, the instructions were sufficient. *See Gammon v. Clark Equip. Co., supra.*

In summary, while the evidence in the Sumner Simpson papers of Raymark's knowledge of the dangerousness of its product was not relevant in the context of the trial of Lockwood's strict liability claim, we find no reversible error in the trial court's handling of this evidence. Not only did Raymark fail to preserve any error for appeal with regard to this evidence, but the trial court's instructions to the jury clearly delineated the separate elements of Lockwood's negligence and strict liability claims, thus enabling the jury to consider the evidence in its proper legal context.

Next, Raymark argues that even if the evidence in the Sumner Simpson papers was relevant, it should have been excluded because it was unfairly prejudicial and was likely to confuse and mislead the jury. Raymark argues that because the letters that were admitted were culled from over 5,600 pages that comprise the entire Sumner Simpson papers, they were presented out of context and therefore were highly prejudicial. Raymark also contends that Lockwood sought to introduce the papers to raise a conspiracy argument or to urge the jury sub rosa to award punitive damages, and because those theories were not available, the introduction of the papers could only have confused or misled the jury.

Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. ER 403. The trial court has broad discretion in balancing the probative value of evidence against the potentially harmful consequences that might result from its admission. *State v. Coe,* 101 Wn.2d 772, 782, 684 P.2d 668 (1984); *State v.*

*Gatalski,* 40 Wn. App. 601, 610, 699 P.2d 804, *review denied,* 104 Wn.2d 1019 (1985).

■ The term "unfair prejudice" as it is used in rule 403 usually refers to prejudice that results from evidence that is more likely to cause an emotional response than a rational decision by the jury. 5 K. Tegland § 106, at 249–50. According to the advisory committee's notes on Fed. R. Evid. 403, which is identical to ER 403, "'unfair prejudice' means an 'undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" 1 J. Weinstein & M. Berger, *Evidence* ¶ 403[03], at 403–33 (1985). We do not believe that the evidence admitted from the Sumner Simpson papers presented a danger of unfair prejudice which substantially outweighed its probative value. The letters were probative of Lockwood's negligence claims. There is nothing unduly inflammatory in the letters themselves that would prevent the jury from making a rational decision. Two federal courts have reached similar conclusions regarding the same evidence. In *Jackson v. Johns–Manville Corp.,* 750 F.2d 1314 (5th Cir. 1985), *cert. denied,* 106 S. Ct. 3339 (1986), the Fifth Circuit stated, "Nothing in the letters is of such an inherent nature as to inflame the passions of the jury or invoke its sympathies." *Jackson,* at 1319. *See also Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492, 1502 (11th Cir. 1985) (evidence in Sumner Simpson letters not inflammatory).

We also conclude that there was little danger that the introduction of this evidence would confuse the issues or mislead the jury. Raymark made use of an opportunity to place the letters in their proper context for the jury. Furthermore, the trial court's clear instructions reduced any likelihood that this evidence would be confusing or misleading. *See Hendrix,* at 1502.

In short, after applying ER 403, we find no manifest abuse of discretion in the trial court's admission of the Sumner Simpson letters.

To summarize our holding with regard to the Sumner

Simpson papers, we conclude that the trial court did not err in admitting them. They were adequately authenticated and relevant to Lockwood's negligence claim. Furthermore, it was not necessary to exclude them pursuant to ER 403.

### Post–Exposure Evidence

Next, we must consider if the trial court erred in admitting evidence of knowledge of the dangers of asbestos which Raymark acquired after Lockwood's last exposure to asbestos in the shipyards. This evidence was admitted as relevant to Lockwood's claim that Raymark had a continuing duty to warn him of the dangers of its products after he was no longer exposed to asbestos.

The evidence at issue consists of three documents dated after 1972, when Lockwood retired.[8] First, Lockwood introduced notes written in 1974 by John Marsh, Raymark's Director of Environmental Affairs. In these notes, Marsh describes his attempts to communicate with Raymark management about the seriousness of the asbestos health issue, and his assessment of that issue. The second document is a post–1974 review of literature on asbestos health from 1906 to 1974, which was prepared by Raymark officials. Finally, Lockwood introduced a 1977 paper by the corporate medical director of Raymark on the medical aspects of occupational exposure to asbestos.

Raymark contends that the trial court erred in admitting these documents because they are not relevant to its duty to warn Lockwood of the hazards of asbestos. Raymark argues that any liability for failure to give such a warning depends only on the extent of its knowledge of asbestos hazards when its product was manufactured or sold, or at the latest, when Lockwood was last exposed to asbestos

---

[8]The Court of Appeals treated this issue as applicable to the admissibility of some of the American Textile Institute documents as well. However, all of the ATI documents that were admitted at trial concern meetings that occurred between 1954 and 1971. Because they are all dated prior to the end of Lockwood's employment, they do not constitute evidence of knowledge which Raymark acquired after Lockwood's exposure. Hence, this issue does not pertain to them.

products. It contends that any evidence of knowledge it acquired after Lockwood's last exposure is irrelevant, because there was no continuing duty to warn Lockwood of the dangers of asbestos after he was no longer exposed to the product.[9]

First, we address the relevance of the post–exposure evidence to Lockwood's negligence claim. In *Ewer v. Goodyear Tire & Rubber Co.,* 4 Wn. App. 152, 161–62, 480 P.2d 260 (1971), the court held that a manufacturer has a duty to warn consumers of the dangerous propensities of its product of which it has knowledge, unless such dangers are obvious. However, the defendant in *Ewer* knew that its product was potentially hazardous before the particular product that caused the plaintiff's injury was sold. Thus, that case does not concern whether a manufacturer has a continuing duty to warn persons of dangers about which it learns after such persons are exposed to its product.

In *Johns–Manville Sales Corp. v. Janssens,* 463 So. 2d 242 (Fla. Dist. Ct. App. 1984), the plaintiff sought to introduce evidence of the defendant's knowledge of the health hazards of using asbestos products after the period when plaintiff was exposed to such products. The court held that the defendant's continuing duty to warn after the date of plaintiff's last exposure was properly at issue under the plaintiff's general claim of a negligent failure to warn. Furthermore, the post–exposure evidence was relevant to the defendant's continuing duty to warn. *Johns–Manville Sales Corp.,* at 256.

Lockwood argues that, because of the unique nature of asbestos exposure and disease, it is particularly appropriate to recognize a continuing duty to warn after such exposure ceases. Lockwood emphasizes that the health risks to persons exposed to asbestos continue after exposure. Hence, cases involving asbestos exposure are different from many

---

[9]Again, because Lockwood's claims arose before the effective date of the Washington tort reform act of 1981, RCW 7.72.010 *et seq.,* the provisions of that act do not apply to this case.

other cases involving failure to warn of the dangers of a product, where the danger often ceases once the product is no longer being used. Specifically, Lockwood points out that after his exposure to asbestos ended, he permanently carried in his lungs the asbestos fibers he had inhaled. Lockwood argues that if he had been informed after he stopped working at the shipyards of the danger due to asbestos exposure and of the risk of smoking while asbestos fibers remained in his body, he could have reduced his disability by stopping smoking.

We believe that where a person's susceptibility to the danger of a product continues after that person's direct exposure to the product has ceased, the manufacturer still has a duty after exposure to exercise reasonable care to warn the person of known dangers, if the warning could help to prevent or lessen the harm. Such a warning should be required to the extent practicable. Thus, it will depend on the circumstances if a warning to previous users of the product must be made by direct personal contact with such users. Alternative warning methods which may be reasonable in a given situation might include notices to physicians or advertisements.

In this case, in view of the expert testimony at trial that asbestos remains in the lungs long after exposure and that cigarette smoking aggravates asbestosis, we believe that if Raymark had made a reasonable effort to provide Lockwood with the information it acquired about the dangers of asbestos exposure after his retirement, the seriousness of his injury might have been reduced. Under these circumstances, Raymark had a continuing duty to warn Lockwood of the known dangers of its product after he was no longer exposed to it. Therefore, the evidence of Raymark's knowledge of the hazards of asbestos after Lockwood's exposure ceased was relevant to his negligence claim.[10]

---

[10]We also note that the trial court's instructions to the jury provided a sufficient basis for Lockwood to argue that Raymark had a continuing duty to warn sounding in negligence. Instruction 13, to which Raymark did not object at trial,

Raymark also contends that even if the post–exposure evidence was relevant to Lockwood's negligence claim, it was irrelevant to his strict liability claim. This argument appears to be highly persuasive. However, as with the Sumner Simpson papers, Raymark did not request an instruction limiting the use of the post–exposure evidence to Lockwood's negligence claim. Therefore, Raymark failed to preserve whatever error occurred in admitting this evidence with respect to Lockwood's strict liability claim.

Raymark also argues that the post–exposure evidence was inadmissible hearsay. The Court of Appeals determined that the record failed to disclose an objection to the trial court on this basis and, therefore, declined to consider this issue. *Lockwood v. A C & S, Inc.*, 44 Wn. App. 330, 351 n.18, 722 P.2d 826 (1986). At trial, Raymark did object to the admission of the "John Marsh documents" and mentioned that it had submitted a brief discussing hearsay problems. That brief deals only with hearsay problems of the American Textile Institute documents and does not mention the Marsh documents. However, later at trial, Raymark seems to have argued that these documents could not be considered admissions on behalf of Raymark. The parties also engaged in other discussions with the trial court about these documents which alluded to hearsay problems. Thus, we conclude that Raymark properly preserved this issue for review.

Lockwood argues that these documents were admissible under ER 801(d)(2), which provides that an admission by a party opponent is not hearsay. ER 801(d)(2) states, in pertinent part:

A statement is not hearsay if—

. . .

(2) *Admission by Party–Opponent*. The statement is offered against a party and is . . . (iii) a statement by a person authorized by him to make a statement concerning the subject, or (iv) a statement by his agent or ser-

implied that once a manufacturer knows of a danger associated with the use of its product, it may have a continuing duty to warn of such danger.

vant acting within the scope of his authority to make the statement for the party . . .

In order for a statement to satisfy these requirements, the declarant must be authorized to make the particular statement at issue, or statements concerning the subject matter, on behalf of the party. *Kadiak Fisheries Co. v. Murphy Diesel Co.,* 70 Wn.2d 153, 163, 422 P.2d 496 (1967); *Barrie v. Hosts of Am., Inc.,* 94 Wn.2d 640, 644, 618 P.2d 96 (1980). There is no evidence that Raymark expressly authorized the declarants to make the specific statements in these documents on its behalf. Where a person does not have specific express authority to make statements on behalf of a party, the overall nature of his authority to act for the party may determine if he is a "speaking agent". 5A K. Tegland, Wash. Prac., *Evidence* § 349, at 160 (2d ed. 1982). In light of the declarants' authority to act as health officials for Raymark, it is reasonable to infer that they were authorized to make statements about the subject of asbestos health issues on Raymark's behalf. Therefore, we conclude that the documents were admissions by a party opponent.

Raymark also argues that even if the declarants of the statements in these documents were authorized speaking agents of Raymark, the statements are inadmissible because they are opinions and not statements of fact. In *Liljeblom v. Department of Labor & Indus.,* 57 Wn.2d 136, 143, 356 P.2d 307 (1960), this court stated that an agent's statement must be a statement of fact and not an expression of opinion in order to be admissible against his principal. However, later cases have questioned the soundness of this proposition, suggesting that the focus should be on whether the statement was made within the authorized scope of the speaker's duties, not on the form of the statement. *See Kennard v. Mountain View Dev. Co.,* 69 Wn.2d 492, 495, 419 P.2d 154 (1966); *Young v. Group Health Coop.,* 85 Wn.2d 332, 337, 534 P.2d 1349 (1975).

We agree with these cases that, under ER 801(d)(2), the important consideration is not if the statement was one of

fact or opinion, but if the declarant had the authority to make it on behalf of the party. ER 801(d)(2) itself does not distinguish between admissions of fact and admissions in the form of opinions. We see no reason to distinguish an agent's statement in the form of an opinion from other opinion evidence. Generally, opinion evidence is admissible if it is helpful to the trier of fact. ER 701, 702. We conclude that, if a statement meets the criteria for an admission by a party opponent in ER 801(d)(2), it is not excludable because it is in the form of an opinion, as long as it is helpful to the trier of fact. *See* 5A K. Tegland § 344, at 149–50; § 349, at 160. To the extent that the statements in the documents at issue here include opinions, we hold that they were not excludable on that basis.

■ Alternatively, Raymark argues that, even if the statements in the literature review and in the paper on medical aspects of asbestos exposure are those of authorized speaking agents for Raymark, they should have been excluded because they were not made by speakers with firsthand knowledge of the facts. Generally, arguments for exclusion of evidence on these grounds have been based on the theory that statements of an agent without firsthand knowledge could too easily be based on rumor or speculation to be routinely admitted. *See* 5A K. Tegland § 344, at 149. The documents at issue in this case do not suffer from this deficiency. Both documents are in the nature of scholarly papers and contain extensive footnotes to sources. Because there is no indication that they are based on rumor or speculation, there was no reason to exclude them on grounds that they did not represent firsthand knowledge of the speakers.

In summary, we are unpersuaded by Raymark's arguments against the admissibility of the post–exposure evidence. This evidence was relevant to Lockwood's negligence claim. In addition, it was not inadmissible hearsay. The trial court did not err in admitting this evidence.

## ATI Documents

Next, we must consider if the trial court erred in admitting certain ATI documents. The ATI documents consist of more than 7,000 pages, chiefly summarizing the proceedings of meetings of the ATI. The documents admitted by the trial court date from 1954 to 1971. They indicate that the asbestos industry was aware of the health hazards of asbestos products and was concerned with how it would be adversely affected by publicity about such dangers.

Raymark argues that the ATI documents were not adequately authenticated and, therefore, the trial court should not have admitted them. The requirement of authentication is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." ER 901(a). Authenticity may be established by the testimony of a witness that the evidence is what it is claimed to be. ER 901(b)(1). To establish a foundation for admission of these documents, Lockwood relied on the deposition of Doris Fagan, the executive secretary of ATI beginning in 1973. Raymark argues that Fagan's deposition does not establish the authenticity of the documents because the admitted documents predated 1973. We believe, however, that Fagan's testimony was adequate to establish that the ATI documents were what they were claimed to be. Furthermore, Raymark has not presented any arguments raising serious questions about the genuineness of these documents. Therefore, we conclude that the documents were properly authenticated.[11]

### JUROR MISCONDUCT

Finally, we must consider if the trial court erred in denying Raymark's motion for a new trial due to the conduct of one of the jurors. Raymark argues that the trial court should have ordered a new trial when it learned that juror

---

[11]Raymark also argues that some of the ATI documents constituted post–exposure evidence which should have been excluded. However, all of the ATI documents admitted at trial were dated before Lockwood's employment ended. Therefore, these documents are not post–exposure evidence. See footnote 8.

Lewis had looked up various defendants on the stock exchange and had told the jury during deliberations that the defendants could well afford to pay damages.

 When a juror places before the jury evidence which has not been introduced at trial, the trial court must review the extrinsic information and decide if it probably had a prejudicial effect on the minds of other jurors. *Gardner v. Malone,* 60 Wn.2d 836, 840, 376 P.2d 651, 379 P.2d 918 (1962). If, after considering all of the pertinent record, the trial court decides that it is reasonably doubtful whether the improper conduct affected the amount of the verdict or the decision of any material issue, it should set aside the verdict and grant a new trial. *Gardner,* at 846; *Halvorson v. Anderson,* 82 Wn.2d 746, 752, 513 P.2d 827 (1973). The trial court has broad discretion in deciding if a new trial should be granted because of such juror misconduct. *Gardner,* at 846; *Halvorson,* at 752.

In this case, the trial court gave the jury a curative instruction immediately after discovering juror Lewis's misconduct. It also conducted a hearing after the verdict in which it questioned the jury foreman. The foreman testified that after the jury received the curative instruction, the subject never came up again in its deliberations.

Courts in other jurisdictions have suggested that, by giving curative instructions, the trial court can remedy the prejudicial effects of a juror's introduction of extrinsic information. *See, e.g., United States v. Bagnariol,* 665 F.2d 877, 884 n.3 (9th Cir. 1981), *cert. denied,* 456 U.S. 962 (1982); *Keyes v. Amundson,* 343 N.W.2d 78, 86–87 (N.D. 1983). In this case, the trial court's curative instruction to the jury promptly and directly dealt with the juror misconduct. We believe that it significantly reduced the probability that the misconduct would have any prejudicial effect. Furthermore, in light of the trial court's careful examination of the proceedings after the verdict was returned, we are convinced that the trial court had little reason to doubt that the misconduct did not affect the verdict. None of Raymark's arguments has persuaded us otherwise. It is

noteworthy that the jury's damages award, $183,372, was substantially lower than the amount Lockwood had requested. The award was well within the evidence admitted at trial. This supports the trial court's conclusion that the extrinsic information presented by Lewis had no prejudicial effect. The trial court did not abuse its discretion in denying Raymark's motion for a new trial based on juror misconduct.

## CONCLUSION

In summary, we conclude that there are no grounds for reversal of the trial court in this case. We hold that Lockwood presented sufficient evidence to establish a prima facie case against Raymark and, therefore, the question of Raymark's liability was properly taken to the jury. In addition, we find no reversible error in the trial court's admission of the challenged evidence. Finally, the trial court did not abuse its discretion in refusing to order a new trial due to juror misconduct. The trial court and the Court of Appeals are affirmed.

## APPENDIX

### PRODUCT LIABILITY AND NEGLIGENCE
### No. 2

Plaintiffs, Albert and Dorothy Lockwood, bring this lawsuit against defendants, Eagle–Picher Industries, Inc.; Keene Corporation; Raymark, Inc.; The Celotex Corporation, successor in interest to Philip–Carey Manufacturing Company; and Pittsburgh–Corning Corporation; to recover compensation for personal injuries allegedly sustained by Albert Lockwood and their marital community.

Albert and Dorothy Lockwood contend that Mr. Lockwood has developed a lung disease called asbestosis proximately caused by exposure to and inhalation of asbestos fibers emitted from products manufactured and/or sold by these defendants.

Plaintiffs bring this action on the basis of two separate claims:

(1) Product liability; and

(2) Negligence.

Each instruction will have a heading at the top indicating whether the instruction applies to the theory of product liability, or negligence, or both.

With respect to plaintiffs' product liability claim, Albert and Dorothy Lockwood claim that each defendant manufactured and/or sold products which were not reasonably safe for use because:

(1) These products contained asbestos, which was not reasonably safe to human life and health; and

(2) These products did not contain adequate warning of the precise dangers involved with asbestos use.

With respect to plaintiffs' negligence claim, plaintiffs contend that the defendants were negligent in one or more of the following respects:

(1) Failure to test the products;

(2) Failure to remove the products from the market;

(3) Failure to inform users of handling methods;

(4) Failure to warn foreseeable product users of the dangers of asbestos.

The plaintiff claims that one or more of these acts was a proximate cause of injuries and damage to the plaintiff. Defendants deny these claims and, further, deny the nature and extent of the plaintiff's claimed injuries.

The foregoing is merely a summary of the claims of the parties. You are not to take the same as proof of the matter claimed unless admitted by the opposing party, and you are to consider only those matters which are admitted or established by the evidence. These claims have been outlined solely to aid you in understanding the issues.

### PRODUCT LIABILITY & NEGLIGENCE
### No. 3

With respect to plaintiffs' product liability claim, the plaintiff has the burden of proving each of the following propositions:

First, that the defendant supplied a product which was not reasonably safe at the time the product left the defendant's control, or defendant failed to give an adequate warning necessary to make the use of the product reasonably safe;

Second, that the plaintiff was injured; and

Third, that the unsafe condition of the product and defendant's failure to warn was a proximate cause of the plaintiff's injury.

With respect to plaintiffs' negligence claim, the plaintiff has the burden of proving each of the following propositions:

First, that a defendant acted, or failed to act, in one of the ways claimed by the plaintiff and that in so acting or failing to act, a defendant was negligent;

Second, that plaintiff Albert Lockwood was injured;

Third, that the negligence of one or more of the defendants was a proximate cause of injury and damage to plaintiff.

### Negligence and Product Liability
### No. 5

If you find two or more causes combine to produce a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about harm, each is charged with responsibility for the harm.

### Product Liability & Negligence
### No. 6

There may be more than one proximate cause of the same alleged harm.

When the concurring negligence and/or product liability of two or more defendants are each proximate cause of an injury, each is liable regardless of the relative degree in which each contributes to the injury.

If you find that the sole proximate cause of the plaintiff's injury was the act or omission of some other person or entity who is not a party to this lawsuit, then your verdict should be for the defendants.

### Product Liability
### No. 7

A manufacturer has a duty to supply products which are reasonably safe for use at the time they leave the manufacturers control. A product is considered "not reasonably safe" or "unreasonably dangerous" if it is unsafe in a way or to an extent beyond that which an ordinary user would reasonably contemplate when using it in a foreseeable manner. In determining what an ordinary user would reasonably expect, you should consider the seriousness of the potential harm from the claimed defect, the cost and feasibility of eliminating or minimizing the risk, and such other factors as the nature of the product and the claimed defect indicate are appropriate.

### Product Liability
### Instruction No. 8

The words "not reasonably safe" refer not only to the condition of the product itself, but a product may also be "not reasonably safe" because of failure to give sufficient directions to the ultimate users as to how to use the product in order to make the product safe and/or the failure to give adequate warnings as to the specific dangers or risks associated with the product.

### Product Liability
### Instruction No. 9

Both seller and a manufacturer have a duty to warn of any condition which renders a product not reasonably safe for a foreseeable use. There is, however, no duty to warn of obvious or known dangers.

Where a warning is required, it must be adequate so that, if followed, the product would be reasonably safe for use. The warning must be appropriate in view of the seriousness of any danger involved to reasonably advise of the consequences of improper use. Such a warning must be in a form which reasonably could be expected to catch the attention of, and to be understood by, the ordinary user.

NEGLIGENCE
No. 11

Negligence is to be judged in light of circumstances or knowledge existent at the time of the occurrence. It is a question of what reasonable men with common sense under the same or similar circumstances, and at the same or similar time, would or should have anticipated in the exercise of reasonable care.

NEGLIGENCE
INSTRUCTION No. 12

A manufacturer's duty to exercise ordinary care is bounded by the foreseeable range of danger. In order to recover on the theory of negligence, plaintiff must prove that the defendant should have anticipated an unreasonable risk of danger to him or to other workers of his class.

NEGLIGENCE
No. 13

In determining the scope of a manufacturer's duty to warn of dangers associated with its products, a manufacturer is under a duty to test, analyze and inspect such products, and is charged with knowing what such tests would have revealed.

In this respect, a manufacturer is held to the knowledge and skill of an expert in determining the dangers that may be inherent in its products. The manufacturer has a duty to keep abreast of research and knowledge in the field.

Once a manufacturer had knowledge of some danger associated with the use of its products, it is afforded a reasonable time, under the circumstances, to warn potential users of such danger.

PRODUCT LIABILITY & NEGLIGENCE
INSTRUCTION No. 18

Evidence may be either direct or circumstantial. Direct evidence is that given by a witness who testifies concerning facts which the witness has directly observed or perceived through the senses. Circumstantial evidence consists of proof of facts or circumstances which, according to common experience, permit a reasonable inference that other facts existed or did not exist. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. One is not necessarily more or less valuable than the other.

### No. 20b

The jury is instructed that should there be a finding of liability for the plaintiff against any defendant the financial circumstances of the particular defendant or defendants is not to be considered by the jury in determining the amount of damages proximately resulting from a defendant's liability, if any.

PEARSON, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DORE, ANDERSEN, CALLOW, and GOODLOE, JJ., concur.