248 P.3d 1052 (2011)
159 Wash.App. 724
James and Kay MORGAN, husband and wife, Appellants,
v.
AURORA PUMP CO., Buffalo Pumps, Inc., Elliott Turbomachinery Company a/k/a Elliot Company IMO Industries, Inc. (sued individually and as), Successor-in-interest to DeLaval Turbine, Inc., Leslie Controls, Inc., Warren Pumps LLC; Weir Valve & Controls USA, Inc. f/k/a Atwood & Morrill; and The William Powell, Co., Respondents.
AGCO Corporation (sued individually and as successor-in-interest to The Buda Co.); Alfa Laval Inc., (sued individually and as successor-in-interest to The DeLaval Separator Company and The Sharples Corp.); Allis Chalmers Corporation Product Liability Trust, (sued individually and as successor-in-interest to Allis Chalmers Corporation and The Buda Company); Armstrong International, Inc.; Atlas Valve Company, Inc.; Blackmer Pump Company; BW/IP International, Inc. (sued individually and as successor-in-interest to Byron Jackson Pump Company); Cameron International Corporation, f/k/a Cooper Cameron Corporation (sued individually and as successor-in-interest to The Cooper-Bessemer Corporation); Carrier Corporation; CLA-VAL Co.; Cleaver-Brooks, Inc. f/k/a Aqua-Chem, Inc., d/b/a Cleaver-Brooks, Division; Coltec Industries, Inc. (sued individually and as successor-in-interest to Fairbanks Morse Engine); Crane Co. (sued individually and as successor-in-interest to Deming Pump); Crane Environmental Inc., (sued individually and as successor-in-interest to Cochrane Corporation); Crosby Valve, Inc.; Crown Cork & Seal Co., Inc. (sued individually and as successor-in-interest to Mundet Cork Company); Detroit Diesel; Dover Corporation (sued individually and as successor-in-interest to The Blackmer Pump Company); Durabla *1053 Manufacturing Company; Eaton Hydraulics, Inc. (sued individually and as successor-in-interest to Vickers, Inc.); Fairbanks Morse Pump Corporation; Flowserve US, Inc. (sued individually and as successor-in-interest to Durco International and Byron Jackson Pumps); FMC Corporation (sued individually and as successor-in-interest to Chicago Pump Company, Northern Pump Company f/k/a Northern Fire Apparatus Company and Chicago Pump Company and Peerless Pump Company); Fryer-Knowles Inc.; Gardner-Denver, Inc.; Gardner Denver Nash, L.L.C. f/k/a The Nash Engineering Company; Garlock Sealing Technologies, LLC. (sued individually and as successor-in-interest to Garlock, Inc. and U.S. Gasket Co.); General Motors Corporation; The Goodyear Tire & Rubber Company; Goulds Pumps, Inc.; Hardie-Tynes, LLC. (sued individually and as Hardie-Tynes Manufacturing Company); Hopeman Brothers Inc.; Hopeman Brothers Marine Interiors, a/k/a Hopeman Brothers, Inc.; Ingersoll-Rand Company (sued individually and as successor-in-interest to Terry Steam Turbine); John Crane, Inc.; McNally Industries, Inc. (sued individually and as successor-in-interest to Northern Pump Company f/k/a Northern Fire Apparatus Company); Metallo Gasket Company, Inc.; Metropolitan Life Insurance Company; The Nash Engineering Company; Northern Pump Company (sued individually and as successor-in-interest to Northern Fire Apparatus); O.C. Keckley Company (sued individually and as successor-in-interest to Klipfel Valves, Inc.); Parker-Hannifin Corporation, (sued individually and as successor-in-interest to Sacomo Sierra and Sacomo Manufacturing Co.); Peerless Heater Company; Peerless Industries, Inc.; Sterling Fluid Systems, Inc. f/k/a Peerless Pumps Co.; Tuthill Corporation; Tyco Flow Control (sued individually and as successor-in-interest to Gimpel Corporation Hancock, Lunkenheimer); Velan Valve Corp.; Viad Corporation f/k/a (sued individually and as successor-in-interest to Griscom Russell Company); Viking Pump, Inc.; Weil Pump Company; Yarway Corporation and York International Corporation, Defendants.
No. 63923-4-I.
Court of Appeals of Washington, Division 1.
January 31, 2011.
*1054 William Joel Rutzick, Schroeter Goldmark & Bender, Seattle, WA, for Appellants.
*1055 John M. Mattingly, Allen E. Eraut, Jeanne F. Loftis, Bullivant Houser Bailey, Portland, OR, Barry N. Mesher, Brian D. Zeringer, Jefrey M. Odoom, Lane Powell, E. Pennock Gheen, Walter Barton, Karr Tuttle Campbell, James E. Horne, Michael E. Ricketts, Gordon Thomas Honeywell Malanca Peterson, Mark B. Tuvin, Kevin J. Craig, Gordon & Rees, Dana C. Hoerschelmann, Russell C. Love, Thorsrud Cane & Paulich, Jerret Sale, Deborah L. Carstens, Bullivant House Bailey, Carl E. Forsberg, Melissa L. Carstens, Bullivant House Bailey, Carl E. Forsberg, Melissa K. Roeder, Forsberg & Umlauf, Seattle, WA, Brian Barrow, Simon Eddins & Greenstone, Long Beach, CA, for Respondents.
SPEARMAN, J.
¶ 1 This appeal stems from an asbestos lawsuit. Kay Morgan appeals the summary judgment dismissal of the Morgans' claims against Aurora Pump Co., Buffalo Pumps, Inc., Elliott Co., IMO Industries, Inc. (formerly DeLaval Turbine, Inc.), Leslie Controls, Inc., Warren Pumps LLC, Weir Valves & Controls USA, Inc. (formerly Atwood & Morrill Co., Inc.), and Wm. Powell Co. (Respondents).[1] James Morgan worked for Puget Sound Naval Shipyard (PSNS) for approximately 37 years, at times during which he performed functions that exposed him to asbestos. He eventually developed mesothelioma. On August 29, 2007, Morgan filed a lawsuit in King County Superior Court against numerous defendants for personal injuries sustained due to asbestos exposure. The trial court dismissed the action on summary judgment as to Respondents. Morgan appeals. We reverse and remand for trial.

FACTS
¶ 2 On August 29, 2007, James and Kay Morgan filed a lawsuit against approximately 50 defendants for personal injuries sustained by James Morgan due to asbestos exposure. Their claims were primarily based on the theories of products liability, negligence, strict liability under RESTATEMENT (SECOND) OF TORTS § 402, and breach of warranty. Morgan had been employed by PSNS from 1952 to 1989. He worked as a pipefitter/steamfitter from 1952 to 1957 and from 1959 to 1963, and as a marine/mechanical engineering technician and design division test coordinator from 1963 to 1989. In 2006 or 2007, he was diagnosed with mesothelioma. Morgan died in January 2008, before his deposition could be completed. After his death, Kay Morgan maintained the action.[2]
¶ 3 Respondents are manufacturers of pumps and valves. Morgan alleges that while he was employed at PSNS, Respondents supplied his employer with pumps and valves that included packing or gaskets containing asbestos. He further alleges that Respondents supplied replacement packing or gaskets to PSNS that also contained asbestos. Morgan claims that when he and others in his presence worked on Respondents' products, asbestos fibers were released into the air. He claims that he developed mesothelioma as a result of inhaling some of these fibers.
¶ 4 Respondents filed separate motions for summary judgment dismissal of Morgan's claims, relying primarily on Braaten v. Saberhagen Holdings, 165 Wash.2d 373, 198 P.3d 493 (2008) and Simonetta v. Viad Corp., *1056 165 Wash.2d 341, 197 P.3d 127 (2008). In those cases, the Washington Supreme Court held, in relevant part, that a manufacturer owes no common law duty to warn of the hazards of an asbestos-containing product that it did not manufacture, sell, or supply. Simonetta, 165 Wash.2d at 354, 197 P.3d 127; Braaten, 165 Wash.2d at 389-90, 198 P.3d 493. Respondents argued below that under Simonetta and Braaten, dismissal was proper because Morgan could not produce evidence creating a material factual dispute that Respondents manufactured, sold, or supplied any of the asbestos-containing products to which he may have been exposed. Respondents also argued that Morgan's evidence did not establish a material factual dispute that their products were a substantial factor in causing his mesothelioma.
¶ 5 The trial court granted the Respondents' motions and dismissed Morgan's claims with prejudice. Morgan appeals.[3]

DISCUSSION
¶ 6 The court reviews summary judgment decisions de novo, engaging in the same inquiry as the trial court. Michak v. Transnation Title Ins. Co., 148 Wash.2d 788, 794-95, 64 P.3d 22 (2003). "When ruling on a summary judgment motion, the court is to view all facts and reasonable inferences therefrom most favorably toward the nonmoving party." Lybbert v. Grant County, State of Wash., 141 Wash.2d 29, 34, 1 P.3d 1124 (2000) (citing Weyerhaeuser Co. v. Aetna Cas. & Sur. Co., 123 Wash.2d 891, 897, 874 P.2d 142 (1994)). Summary judgment is proper if the pleadings, depositions, answers, and admissions, together with the affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c).
¶ 7 It is well settled that asbestos plaintiffs in Washington may establish exposure to a defendant's product through direct or circumstantial evidence. Allen v. Asbestos Corp., Ltd., 138 Wash.App. 564, 571, 157 P.3d 406 (2007). "[I]nstead of personally identifying the manufacturers of asbestos products to which he was exposed, a plaintiff may rely on the testimony of witnesses who identify manufacturers of asbestos products which were then present at his workplace."[4]Lockwood v. AC & S, Inc., 109 Wash.2d 235, 246-47, 744 P.2d 605 (1987). They need not offer a detailed recollection of facts surrounding the exposure to the asbestos-containing product. See Van Hout v. Celotex Corp., 121 Wash.2d 697, 706-07, 853 P.2d 908 (1993); Lockwood, 109 Wash.2d at 246, 744 P.2d 605. For instance, in Van Hout, the Washington Supreme Court held that the evidence was sufficient to sustain the jury's verdict for an asbestos plaintiff where the plaintiff testified that he worked in asbestos dust on ships, and witnesses placed the defendant's asbestos-containing insulation materials on those ships. Van Hout, 121 Wash.2d at 707, 853 P.2d 908. However, "[w]hen reliance is placed upon [circumstantial] evidence, there must be reasonable inferences to establish the fact to be proved." Arnold v. Sanstol, 43 Wash.2d 94, 99, 260 P.2d 327 (1953).
¶ 8 It is equally well settled that the plaintiff in a product liability or negligence action bears the burden to establish a causal connection between the injury, the product and the manufacturer of that product. RCW 7.72.030(1); Iwai v. State, 129 Wash.2d 84, 96, 915 P.2d 1089 (1996): Lockwood, 109 Wash.2d at 245, 744 P.2d 605. In Lockwood, the Washington Supreme Court set forth several factors for courts to consider when evaluating whether sufficient evidence of causation exists against a particular defendant: (1) plaintiff's proximity to the asbestos product when the exposure occurred and the expanse of the work site where asbestos fibers were released; (2) the extent *1057 of time the plaintiff was exposed to the product; (3) the types of asbestos products to which plaintiff was exposed and the ways in which the products were handled and used, and (4) the evidence presented as to medical causation of the plaintiff's particular disease. Lockwood, 109 Wash.2d at 248-49, 744 P.2d 605. The court noted, "[u]ltimately, the sufficiency of the evidence of causation will depend on the unique circumstances of each case," but that "[n]evertheless, the factors listed above are matters which trial courts should consider when deciding if the evidence is sufficient to take such cases to the jury." Id. at 249, 744 P.2d 605. The parties agree that the Lockwood "substantial factor" test applies at summary judgment.
¶ 9 The Lockwood court held that the worker established a prima facie case against the manufacturer of asbestos cloth "by presenting evidence that exposure to asbestos causes asbestosis; that once asbestos dust is released, it can remain in the air and drift with air currents for a long period of time; and that [defendant's asbestos] product was located at shipyards where [the worker] was employed during the period when he worked there," even though he did not introduce evidence that he directly handled the defendant's asbestos products.[5]Lockwood, 109 Wash.2d at 243, 744 P.2d 605.
¶ 10 In Berry v. Crown Cork & Seal Co., Inc., 103 Wash.App. 312, 14 P.3d 789 (2000), we held that the evidence was sufficient to raise a genuine issue of material fact that a PSNS machinist was exposed to asbestos-containing products of the defendant. The machinist worked at PSNS for six years aboard a number of ships and worked around insulators who used insulation materials that created substantial amounts of dust. Id. at 318, 14 P.3d 789. The machinist offered testimony that a distributor was among those who supplied asbestos-containing thermal insulation material to PSNS; certain brands of asbestos-containing thermal insulation were commonly used on ships repaired at PSNS; PSNS obtained those products from distributors; and defendant had been a distributor of those brands of products. See id. at 315-18, 14 P.3d 789. The machinist also offered expert testimony that "because asbestos dust had the ability to drift, an asbestos product used in one part of a ship could expose `workers in vast areas in a shipyard.'" Id. at 318, 14 P.3d 789. The machinist did not submit evidence that he worked directly with the distributor's asbestos products and the evidence did not show how much, if any, of defendant's product was actually released into the shipyard. But this court held that the evidence created a prima facie case under the Lockwood exposure test. Id. at 323-25, 14 P.3d 789. In doing so, we rejected the defendant's argument that the evidence required "impermissible speculation" because the plaintiff did not provide evidence as to how much and how often PSNS purchased products from the defendant as opposed to other distributors. Id. at 324-25, 14 P.3d 789. We wrote, "The extent to which [defendant] supplied the products as compared with other distributors is irrelevant for purposes of summary judgment." Id. at 325, 14 P.3d 789.
¶ 11 In this case, at summary judgment, Morgan provided the declaration and deposition testimony of Melvin Wortman, the declarations of Dr. Eugene Mark and James Millette, Ph.D., the deposition testimony of Jack Knowles, and his own interrogatory answers.
¶ 12 Jack Knowles was a pipefitter at PSNS, where he worked with Morgan. Knowles testified that they worked on three aircraft carriers together: the USS Roosevelt, the USS Midway, and the USS Coral Sea. When they worked together, he and Morgan spent most of their time aboard ship and in machinery spaces. Knowles saw Morgan remove and install piping from equipment, as well as dismantle sections of piping and dismantle valves from piping. Knowles testified that the work Morgan did on flanges included removing asbestos coating on flanges, cutting insulation back from the flanges, removing flange gaskets, and cutting away pieces of pipe to remove flanges.[6] He and Morgan worked in the presence *1058 of machinists, who were responsible for removing and refurbishing the pumps and working on their internal components, including changing the packing. He testified that as pipefitters, he and Morgan did not change the packing in pumps. However, there were times when he and Morgan did internal work on valves, such as replacing packing material. According to Knowles, the flange gaskets he and Morgan removed and installed were primarily made of asbestos, and the packing was pliable asbestos.
¶ 13 Knowles testified that Morgan and other workers in Morgan's presence worked with and around new and existing[7] pumps manufactured by Aurora, Buffalo, DeLaval (IMO), and Warren. He testified that he saw Morgan perform the following tasks on these pumps: break flanges at the pumps, remove and scrape flange gaskets from the pumps, make new flange gaskets for use on new and existing pumps, and remove insulation from flanges. Knowles testified that he saw other workers in Morgan's presence work with packing in connection with new and existing pumps of each of these manufacturers. As to the valve manufacturers, Powell and Weir (Atwood), Knowles testified that he witnessed Morgan remove and scrape gaskets from their valves, and make new gaskets for use on their new and existing valves.[8] Knowles also saw other workers work with packing on and make gaskets for Powell's and Weir's new and existing valves around Morgan, and scrape old gaskets from their valves.[9] Knowles believed the packing was "probably" recommended or specified by the valve manufacturer. Knowles testified repeatedly that the conditions in the air were dusty and dirty when work on the valves and pumps was being performed.
¶ 14 The deposition and declaration of Melvin Wortman were taken in another case and related to the period from 1967 to 1971, when he was the superintendent of machinists at PSNS.[10] Wortman stated that during that period, almost all of the pumps used onboard Navy ships contained asbestos gaskets and packing. He estimated that 50 percent of the replacement parts obtained by PSNS, including replacement parts for pumps, compressors, valves, and other equipment, came from the original manufacturer. Wortman also stated that most of the gaskets and packing that were in valves, pumps, and compressors when they came into the shop for overhaul were probably provided by the original manufacturer.[11]
¶ 15 James Millette, Ph.D., stated in his declaration:
James Morgan's work to remove asbestos-containing gaskets and packing from the above equipment as well as fabricating new gaskets, resulted in exposures to asbestos that were substantially above ambient levels. This would also hold true whenever he remained in airspaces contaminated by such work conducted by others that involved gasket removal, fabrication, and replacement.
Additionally, he stated that during the time period in question, gaskets and packing to which Morgan was exposed were primarily made of asbestos.
¶ 16 Dr. Eugene Mark, a pathologist, concluded that Morgan had "developed a diffuse malignant mesothelioma of the pleura" and *1059 that the asbestos to which Morgan was reportedly exposed while working at PSNS was the cause of the disease.
¶ 17 In addition, Morgan points to certain "admissions from defendants" as corroborating his evidence about where the original and replacement packing and gaskets came from. Specifically, each of the Respondents, other than Warren, conceded that the new pumps or valves that it supplied included asbestos-containing packing and gaskets and that it sold, in varying degrees, asbestos-containing replacement packing or gaskets.
¶ 18 Based on this evidence, Morgan argues that he has raised a genuine issue of material fact that he was exposed to asbestos contained in products that were made, sold, or supplied to PSNS by each of the Respondents and that such exposure was a substantial factor in causing his mesothelioma.
¶ 19 Respondents acknowledge supplying PSNS with pumps or valves, but argue that Morgan's evidence is insufficient to create a material dispute about whether the new pumps and valves or the replacement materials they supplied to PSNS contained asbestos. For example, Aurora claims that "the only evidence regarding a brand-new Aurora pump that was sent to PSNS concerns a GNC-17 End Suction Navy Pump that was shipped in 1960 and that was used to pump aviation fuel on the U.S.S. Coral Sea." It claims that pump utilized mechanical seals that eliminated the need for packing and internal gaskets, and thus a jury could not reasonably infer that Morgan was exposed to asbestos packing or gaskets that it sold or supplied. IMO argues that "[e]ven if one could conclude that Mr. Knowles observed Mr. Morgan working around DeLaval pumps in which new packing supplied by DeLaval was being installed, there is no basis to also conclude that the packing contained asbestos. . . . [T]he evidence regarding the particular types of pumps described by Mr. Farrow and Mr. Knowles is that the `vast majority' did not have asbestos-containing packing (or gaskets)." Weir argues that "while there is evidence that Atwood & Morrill may have sold some replacement parts to the Navy, plaintiff offered no evidence to prove that any asbestos-containing replacement parts supplied by Atwood & Morrill were actually present at PSNS, or were ever used on any ship in Mr. Morgan's presence."
¶ 20 The Respondents also contend that Morgan presented insufficient evidence that he worked on or around any of their products in such a manner that he was exposed to any asbestos. For example, Weir points out that Michael Farrow testified that he saw Morgan working with Atwood valves "`many times.'" But Weir contends that when pressed for specifics, Farrow could only point to an instance when Morgan removed an Atwood valve "from the machinery space in the engine room aboard the USS Princeton in March 1954." Farrow did not know whether the valve contained asbestos packing, nor did he see Morgan working on the internal components of the valve.
¶ 21 Finally, Respondents argue that even to the extent Morgan offered evidence of his exposure to asbestos contained in products that they sold, the evidence is insufficient to establish a material dispute that the exposure was a substantial factor in causing his mesothelioma. They contend that the evidence of Morgan's exposure to their individual products is insufficient as a matter of law to find that their products were a substantial factor in causing his disease, particularly in comparison to his exposure to other asbestos-containing products at PSNS. They also argue, in regard to Morgan's exposure to asbestos in packing, that it cannot be a substantial factor because Morgan's own expert opined that new and unused packing is not "friable," i.e., does not release respirable asbestos fibers when manipulated. In addition, Respondents point out that Morgan's causation experts have no personal knowledge of Respondents' specific products or of Morgan's alleged exposure to them but instead rely on the testimony of Farrow, Knowles and Wortman.[12]
*1060 ¶ 22 We agree with Morgan that when the evidence is viewed in a light most favorable to him, there are disputed issues of material fact regarding: (1) whether Morgan was exposed to asbestos-containing products made, sold, or supplied by Respondents and (2) whether, under Lockwood, such exposure was a substantial factor in causing his mesothelioma.
¶ 23 First, Morgan has presented evidence that he was exposed to asbestos contained in products manufactured, sold, or supplied by Respondents. This evidence is found in the combined testimony of various witnesses. Knowles testified that he saw Morgan, or other workers in Morgan's presence, work on the internal parts of all of the Respondents' pumps and valves. And all of the Respondents, except Warren, acknowledge supplying replacement parts to PSNS on occasion. In addition, Wortman testified that approximately 50 percent of replacement parts he saw came from the original manufacturers.
¶ 24 The Respondents vigorously contest this evidence, but the majority of their arguments go to the weight and credibility of Morgan's evidence or attempt to contradict his evidence with their own evidence.[13] Some Respondents contend that Morgan does not offer evidence that he directly worked with the internal parts of their pumps, while overlooking Morgan's evidence that he worked around others who did this work.[14] Washington courts do not require a plaintiff himself to work directly with a defendant's asbestos-containing material. Warren makes the point that Wortman's testimony relates to a different time period, which is a relevant consideration. But a reasonable inference can be drawn that the brands of parts used at PSNS did not change significantly within a few years.[15] Whether new packing is friable is also relevant, but as Morgan points out, there is conflicting evidence about that issue. Moreover, Morgan claims not only that he was exposed to asbestos in new packing; he also alleges he was exposed to asbestos during the removal of used packing and gaskets. Some Respondents put forth their own evidence about the specific products they supplied to PSNS and why Morgan could not have been exposed to asbestos from these products, but Morgan is correct in that this evidence is contradicted by his own witnesses' testimony.[16]
*1061 ¶ 25 The Respondents rely on Braaten, and Simonetta to argue that Morgan's evidence is insufficient as a matter of law to survive summary judgment, but their reliance on these cases is misplaced. Braaten is the more relevant decision because in Braaten the defendants were also manufacturers of pumps and valves that were sold to the Navy and used aboard ships. The trial court dismissed Mr. Braaten's case on summary judgment and the Washington Supreme Court affirmed because his evidence was insufficient to show that he was exposed to asbestos originally contained in packing and gaskets supplied by the defendants, and there was no evidence that the defendants sold or supplied the replacement packing or gaskets to which Mr. Braaten was allegedly exposed. Braaten, 165 Wash.2d at 380-81, 198 P.3d 493. The court specifically noted the incontroverted testimony of Mr. Braaten that he did not work with new pumps and valves; that he was not exposed to asbestos when others installed new pumps; and that by the time he worked on the defendants' products, it was impossible to tell how many times the original packing and gaskets supplied by the defendants had been replaced with packing and gaskets supplied by other companies. Id. at 381-82, 198 P.3d 493. But Morgan, unlike Mr. Braaten, presented evidence that he was exposed to asbestos originally contained in products supplied by Respondents or asbestos in replacement products supplied by Respondents.
¶ 26 The next issue is whether Morgan presented sufficient circumstantial evidence to create an issue of fact that under Lockwood, his alleged exposure to Respondents' asbestos products was a substantial factor in causing his mesothelioma. The first factor concerns Morgan's proximity to the asbestos product when the exposure occurred and the expanse of the work site where asbestos fibers were released. The second factor is the extent of time the plaintiff was exposed to the product. "The proximity and time factors can be satisfied if there is evidence that the plaintiff worked at a job site where asbestos products were used, particularly where there is expert testimony that asbestos fibers have the ability to drift over an entire job site." Allen, 138 Wash.App. at 571, 157 P.3d 406. Morgan worked as a pipefitter at PSNS for approximately nine years and developed mesothelioma.[17] It would be virtually impossible to know exactly how much time Morgan was exposed to the products of each Respondent. But Knowles testified that he saw Morgan or workers around Morgan work with Respondents' pumps and valves, and both Knowles and Wortman testified that at least some, if not most, of the gaskets and packing were made of asbestos. Also, Morgan provided expert testimony that removing asbestos-containing gaskets and packing resulted in exposures to asbestos that were "substantially above ambient levels." This was also "true whenever he remained in airspaces contaminated by such work conducted by others that involved gasket removal, fabrication, and replacement."
¶ 27 The third factor is the types of asbestos products to which a plaintiff was exposed and the ways in which the products were handled and used. Here, the asbestos attributed to Respondents was in packing and gaskets that either arrived at PSNS with or inside their pumps and valves, or were supplied to PSNS as replacement packing and gaskets. The parties generally dispute both that Respondents' pumps and valves contained asbestos and that they were handled *1062 and used in such a manner that asbestos fibers were released in Morgan's vicinity. But he presented evidence that, at the very least, created an issue of fact as to whether the work he or others did on Respondents' pumps and valves resulted in asbestos exposure.
¶ 28 The last Lockwood factor is the evidence presented as to medical causation of the plaintiff's particular disease.
Such evidence would include expert testimony on the effects of inhalation of asbestos on human health in general and on the plaintiff in particular. It would also include evidence of any other substances that could have contributed to the plaintiff's disease, and expert testimony as to the combined effects of exposure to all possible sources of the disease. The consideration of other potential sources of the plaintiff's injury is necessary because exposure to materials other than asbestos may also cause a number of the diseases associated with inhalation of asbestos fibers, and the risk of contracting disease may be increased by the combined effects of exposure to more than one substance, such as asbestos and cigarette smoke.
Lockwood, 109 Wash.2d at 248-49, 744 P.2d 605 (internal citation omitted). Here, pathologist Eugene Mark, M.D., concluded that Morgan had "developed a diffuse malignant mesothelioma of the pleura" and that the asbestos to which Morgan was reportedly exposed while working at PSNS was the cause of the disease. Respondents do not allege that there was any other factor causing Morgan's mesothelioma besides his exposure to asbestos at PSNS.
¶ 29 Respondents argue that the evidence of Morgan's exposure to their individual products is insufficient as a matter of law to find that their products were a substantial factor in causing his disease, particularly considering his likely exposure to other asbestos-containing products at PSNS. While we do not decide the frequency of asbestos exposure a plaintiff must demonstrate to survive summary judgment, we note that this case involves allegations of more than a single instance of exposure to asbestos from each Respondent's products. Knowles testified that Morgan worked with new and existing pumps or valvespluralfrom each Respondent, which means that Morgan could have been exposed to asbestos in each Respondent's products numerous times during the years he worked at PSNS, particularly in his capacity as a pipefitter/steamfitter. For purposes of summary judgment, this showing is sufficient.
¶ 30 Finally, regarding Respondents' government-contractor defense, we agree with the trial court that it is an affirmative defense that is fact-intensive and a matter for the jury.[18]
¶ 31 In sum, Morgan alleges evidence that raises an issue of material fact as to whether he was exposed to asbestos from each Respondent and whether the exposure was a substantial factor in causing his mesothelioma. The trial court erred in dismissing his claims on summary judgment.
¶ 32 Reverse.
WE CONCUR: GROSSE and SCHINDLER, JJ.
NOTES
[1] We note that Morgan has voluntarily dismissed his appeal as to Elliott Co. In addition, Respondent Leslie Controls, Inc. has filed a petition for relief pursuant to chapter 11 of the federal bankruptcy code in the United States Bankruptcy Court for the District of Delaware, case no. 10-12199. "The filing of a bankruptcy petition creates a bankruptcy estate, which is protected by an automatic stay of actions by all entities to collect or recover on claims." In re Palmdale Hills Prop., LLC, 423 B.R. 655, 663 (B.A.P. 9th Cir.2009) (citing 11 U.S.C. §§ 541(a) and 362(a)). Accordingly, all proceedings against Leslie in this matter are stayed. However, the automatic stay provision does not apply to suits against a debtor's co-respondents and co-defendants in multi-defendant litigation. In re Matter of Johns-Manville Corp., 99 Wash.2d 193, 196, 660 P.2d 271 (1983). Therefore, our opinion in this case applies to all remaining Respondents except Leslie.
[2] Although James Morgan died in 2008, it does not appear that a personal representative has been substituted as the plaintiff. For that reason, as well as for clarity and ease of reference, we will refer to James Morgan as if he were the sole Appellant "Morgan."
[3] Morgan does not appeal the trial court's dismissal of his design-defect claims.
[4] The court explained: "Because of the long latency period of asbestosis, the plaintiff's ability to recall specific brands by the time he brings an action will be seriously impaired. A plaintiff who did not work directly with the asbestos products would have further difficulties in personally identifying the manufacturers of such products. The problems of identification are even greater when the plaintiff has been exposed at more than one job site and to more than one manufacturer's product." Lockwood, 109 Wash.2d at 246-47, 744 P.2d 605 (internal citation omitted).
[5] Lockwood involved an appeal from a denial of the defendant's motions for a directed verdict, judgment notwithstanding the verdict, or a new trial.
[6] It is undisputed that Respondents did not manufacture, sell, or supply flange gaskets or insulation.
[7] The word "existing" is used by the parties to refer to non-new pumps and valves.
[8] In a different part of his testimony, he stated that he did not know if any of the Atwood valves that he witnessed Morgan working with were brand new.
[9] Knowles stated later in the deposition that he did not have a specific recollection that the Atwood valves he witnessed Morgan working with contained packing.
[10] During this time, Morgan was a technician in the engineering design shop.
[11] Warren Pumps filed a notice of cross-appeal of the trial court's denial of Warren's Joint Motion to Strike Portions of the Declaration of Melvin Wortman. However, Warren does not preserve this issue by properly raising and discussing the issue in its opening brief. See Sacco v. Sacco, 114 Wash.2d 1, 5, 784 P.2d 1266 (1990). While IMO's briefing includes argument as to why the Wortman declaration should not be considered by this court, it acknowledges that it has not cross-appealed the trial court's ruling not to strike. Accordingly, we decline to review the trial court's admission of this evidence, and consider the Wortman declaration as the trial court did.
[12] Some Respondents also argue that Morgan's claims against them are barred by the government-contractor defense. Buffalo cites Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) and argues that it cannot be held liable because its pumps and their components were furnished to the Navy in conformance with its precise specifications, making Buffalo immune under the government-contractor defense. Moreover, it argues that the Navy had superior knowledge of any hazards posed by asbestos exposure and was a superseding cause. Powell and Weir also claim the government-contractor defense.

In response, Morgan points out that in Timberline Air v. Bell Helicopter-Textron, 125 Wash.2d 305, 324-30, 884 P.2d 920 (1994), the Washington Supreme Court explained that the issues are "generally different in a government specification defense based on warnings than in a government specification defense based on design defect." He also points out that Buffalo admits that the military specification defense was only raised with regard to Morgan's design defect claim. "Thus, there is no basis to dismiss plaintiffs' warning claims based upon the government-contractor defense."
[13] For example, Weir points out that Michael Farrow testified that he saw Morgan working with Atwood valves "`many times.'" But Weir contends that when pressed for specifics, Farrow could only point to an instance when Morgan removed an Atwood valve "from the machinery space in the engine room aboard the USS Princeton in March 1954." Farrow did not know whether the valve contained asbestos packing, nor did he see Morgan working on the internal components of the valve. Weir argues that "while there is evidence that Atwood & Morrill may have sold some replacement parts to the Navy, plaintiff offered no evidence to prove that any asbestos-containing replacement parts supplied by Atwood & Morrill were actually present at PSNS, or were ever used on any ship in Mr. Morgan's presence."
[14] For example, according to Warren, Morgan presented no evidence that he worked on the internal parts of a Warren pump. "Thus, Plaintiffs' entire claim against Warren is founded on Mr. Knowles's testimony that Plaintiff was nearby when someone else worked with brand-new packing on a Warren pump."
[15] Warren points out that Wortman's testimony was limited to 1967 to 1971, when Morgan worked in the engineering design shop. "Because Plaintiff was not working with Mr. Wortman in Shop 31, and was not working on any equipment during the relevant time period (1967-1971), Mr. Wortman's testimony about the use of replacement components inside the machine shop is not relevant to plaintiff's claims."
[16] For instance, IMO argues that "[e]ven if one could conclude that Mr. Knowles observed Mr. Morgan working around DeLaval pumps in which new packing supplied by DeLaval was being installed, there is no basis to also conclude that the packing contained asbestos. . . . [T]he evidence regarding the particular types of pumps described by Mr. Farrow and Mr. Knowles is that the Vast majority' did not have asbestos-containing packing (or gaskets)."

Morgan argues that evidence that he worked with or around material originally supplied by DeLaval was contained in Knowles's testimony: He answered "yes" to the question, "Do you recall seeing other people work with packing in Mr. Morgan's presence on brand-new DeLaval pumps?" Morgan argues that IMO's claim that he worked only around fuel oil/lube oil pumps and its corporate representative's testimony that the vast majority of those gaskets and packing were non-asbestos materials did not have to be believed by the jury, because there was conflicting testimony. Morgan points to Knowles' testimony that "`most of that [packing] was a pliable asbestos.'"
[17] Although he was employed at PSNS for approximately 37 years, his claim focuses primarily on the time that he worked as a pipefitter.
[18] In its oral ruling, the court stated, "With regard to the military specification defense, it would be an affirmative defense. The burden would be on any or all of the defendants to prove it by a preponderance of the evidence to the trier of the fact."